FILED

02/08/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0231

DA 21-0231

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 26

YELLOWSTONE DISPOSAL, LLC,

        Petitioner and Appellant,

    v.

STATE OF MONTANA, DEPARTMENT
OF ENVIRONMENTAL QUALITY,

        Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. CDV 2020-1080
                    Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Matt J. Kelly, Nicholas R. VandenBos, Tarlow Stonecipher Weamer &
                Kelly, PLLC, Bozeman, Montana

        For Appellee:

                Nicholas A. Whitaker, Staff Attorney, Department of Environmental
                Quality, Helena, Montana

                              Submitted on Briefs:  January 5, 2022

                                      Decided:  February 8, 2022

Filed:

                                _____
                                         Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Yellowstone Disposal, LLC (Yellowstone Disposal), appeals the dismissal of its petition for writ of mandamus by the First Judicial District Court, Lewis and Clark County.

¶2 We affirm and address the following issue:

*Did the District Court err by denying Yellowstone Disposal's petition for writ of mandamus?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Montana Department of Environmental Quality (DEQ) is responsible for regulating solid waste management systems[1] (SWMS) pursuant to The Montana Solid Waste Management Act (SWMA). Section 75-10-203(2), MCA; § 75-10-204, MCA. DEQ is statutorily empowered to adopt administrative rules governing "requirements for the plan of operation and maintenance that must be submitted with an application [for a license to operate an SWMS]." Section 75-10-204(1), MCA. A company "may not dispose of solid waste or operate a solid waste management system without a license from [DEQ]." Section 75-10-221(1), MCA. In addition to its own administrative rules, DEQ is required to follow the environmental review procedures of the Montana Environmental Policy Act (MEPA) set forth in § 75-1-208, MCA.

¶4 On June 16, 2015, Yellowstone Disposal applied to DEQ for a Class II SWMS license (License) to operate a SWMS in Richland County. On November 25, 2015, DEQ

---

[1] A solid waste management system is "a system that controls the storage, treatment, recycling, recovery, or disposal of solid waste." Section 75-10-203(12), MCA. In this case, Yellowstone Disposal is seeking a license to build a landfill facility.

advised Yellowstone Disposal its application was incomplete and required additional information. Yellowstone Disposal provided the requested information and on March 11, 2016, DEQ notified Yellowstone Disposal its application was complete according to licensing requirements and contained the information needed to prepare an Environmental Assessment (EA), which would be subject to a 30-day public comment period. Months passed and Yellowstone Disposal contacted DEQ about the status of its application. On August 17, 2016, DEQ responded in writing that it was "currently processing the license application . . . but has determined that additional time is necessary to complete the environmental evaluation and publish the [EA]. Therefore, the [Solid Waste Program] is extending the review time by an additional 90 days." The letter reiterated the 30-day public comment requirement, stated DEQ would contact Yellowstone Disposal about the time and location of the public meeting, and concluded with the assurance that: "The final licensing decision will be made on or before close of business by December 12, 2016, after the public comment period has ended and all substantive comments have been evaluated and addressed."

¶5 DEQ issued a draft EA for the project on November 28, 2017, over a year after the letter announcing the "90 day" extension. The draft concluded: "The proposed licensure of the [Yellowstone Disposal] Facility would meet the minimum requirements of the Montana Solid Waste Management Act and associated administrative rules regulating solid waste disposal" and "[c]onstruction and operation of the Facility does not conflict with any local, state, or federal laws, requirements or formal plans." The draft was followed by two public meetings, one held on December 18, 2017, and, after announcing by press release

3

that it was extending the public comment period by another 45 days, DEQ held a second meeting on March 7, 2018. Following this second meeting, DEQ would not directly contact Yellowstone Disposal again until January 2019.

¶6    In the interim, two events occurred that are central to the current dispute. First, in March 2018, the Richland County Commission passed a resolution creating the McGlynn Reservoir Citizen Initiated Zoning District. On December 4, 2018, the Richland County Planner notified DEQ by letter (Zoning Letter) that, under the new zoning district, the zoning certificate originally issued to Yellowstone Disposal in June 2015 regarding siting of the proposed landfill was no longer valid. To proceed at that location, Yellowstone Disposal would need to apply for a conditional use permit. Second, the Federal Aviation Administration (FAA) determined that Yellowstone Disposal had failed to secure a necessary exemption in order for its proposed facility to accept putrescible waste.[2] In response, Yellowstone Disposal notified DEQ on August 28, 2018, that it no longer planned to accept putrescible waste at its proposed facility.[3]

---

[2] "Putrescible wastes means solid waste which contains organic matter capable of being decomposed by microorganisms and of such a character and proportion as to be capable of attracting or providing food for birds." 40 C.F.R. § 257.3-8(e)(7) (1979).

[3] The parties disagree as to whether this notification by Yellowstone Disposal constituted a legally relevant "modification" of the application and whether the alleged modification resulted in the statutory timeline being "reset" for DEQ to process the application. DEQ argues that its "compliance with [MEPA time limits] must be measured from the most recent version of the application submitted by the applicant." Yellowstone Disposal argues that "DEQ's 'modification = new application timeline' argument is simply a convenient posture for this litigation." We conclude that resolution of the appeal does not require that we address whether the notification constituted a modification of the application and to what effect. However, for convenience herein, we refer to the "original application" and the "modified application" to distinguish between the two.

4

¶7 On January 8, 2019, DEQ sent Yellowstone Disposal a copy of Richland County's Zoning Letter and conveyed the following in an accompanying letter (Stay Letter):

> DEQ has decided to stay its environmental review and licensing determination . . . until Yellowstone Disposal submits a new zoning certification from Richland County. Without valid zoning certification from the appropriate local authority, Yellowstone Disposal's application for a SWMS license is incomplete, and DEQ cannot undertake an adequate environmental review or issue a license on an incomplete application. Furthermore, Yellowstone Disposal may need to amend its proposal to meet the requirements for a conditional use permit from Richland County, and it is prudent for DEQ to stay its environmental review until it is determined whether any additional amendments are made to the proposal.

¶8 A year passed while Yellowstone Disposal worked with Richland County to resolve the zoning issue. Yellowstone Disposal had not yet secured a conditional use permit from Richland County or otherwise resolved the issue when its counsel contacted DEQ on January 23, 2020, requesting a meeting to discuss three issues: 1) the timeliness of DEQ's review of Yellowstone Disposal's application; 2) DEQ's rationale for suspending review; and 3) the current status of the facility and the application. Counsel for Yellowstone Disposal continued to communicate with DEQ and repeatedly asked for DEQ's official position on these issues in writing. DEQ did not provide further written explanation. On April 24, 2020, Yellowstone Disposal sent a demand letter to DEQ, stating, "Yellowstone Disposal demands that [DEQ] issue the [License] without further delay," citing § 75-1-208(7)(a), MCA.

¶9 Following the demand letter, Yellowstone Disposal met with DEQ representatives, including the Department's Director. On May 13, 2020, DEQ sent a formal written response to the demand letter, stating its position was that, because Yellowstone Disposal

5

modified its original application, this change "render[ed] DEQ's initial completeness determination moot," essentially "resetting" the statutory deadlines governing its duty to process the application. It further stated that the Zoning Letter, which arrived before DEQ had made a completeness determination on the modified application, rendered the application incomplete, and only complete applications were "subject to the time limits in § 75-1-208(4), MCA." DEQ characterized its Stay Letter as "a written finding that Yellowstone Disposal's application was incomplete," which, "in accordance with ARM 17.50.513(2), postponed processing the application until such time as Yellowstone Disposal cures the application deficiency."

¶10 On July 13, 2020, Yellowstone Disposal filed a petition for writ of mandamus in the District Court to compel DEQ to issue the License or, in the alternative, issue a final decision approving or denying Yellowstone Disposal's application. DEQ moved to dismiss the petition for failure to state a claim under M. R. Civ. P. 12(b)(6). The District Court recognized that "DEQ took over a year and a half between certifying Yellowstone Disposal's Application as complete and publishing its Draft EA. This length of time greatly exceeded the time limits under both MEPA and SWMA's administrative rules," but nonetheless granted DEQ's motion and dismissed the petition, concluding that "[d]espite DEQ's failure to meet the time limits under MEPA and SWMA, Yellowstone Disposal is not entitled to a license under MCA 75-1-208(7)(a). DEQ had authority to stay the processing and review of Yellowstone Disposal's Application under SWMA and MEPA." The District Court reasoned that, due to Yellowstone Disposal's alleged modification and the position taken by Richland County in its Zoning Letter,

6

DEQ's [Stay Letter] properly postponed Yellowstone Disposal's Application under ARM 17.50.513(2). The Application is incomplete without a valid zoning certificate . . . . Because the Application is incomplete, DEQ may 'postpone processing the application' until Yellowstone Disposal submits the necessary materials to render its Application complete . . . . DEQ's [Stay Letter] constituted a written finding that 'permit issuance . . . would result in the violation of a statutory or regulatory requirement' under MCA § 75-1-208(7)(a) . . . . Without a valid zoning certificate, issuing Yellowstone Disposal a license would violate SWMA's administrative rules . . . . As such, the court cannot compel DEQ to issue Yellowstone Disposal's license under § 75-1-208(7)(a) despite DEQ's failure to complete a timely environmental review.

The court also noted that MEPA and SWMA required DEQ to incorporate the new considerations into its environmental assessment and may require amended or supplemental findings.

¶11 While Yellowstone Disposal raises three issues in challenge to the District Court's order dismissing its petition,[4] we will focus more generally on whether Yellowstone Disposal satisfied the requirements for issuance of a writ of mandamus.

## STANDARDS OF REVIEW

¶12 A district court's decision on whether to grant a writ of mandamus is a legal conclusion we review for correctness. *Allied Waste Servs. of N. Am., LLC v. Mont. Dep't of Pub. Serv. Regulation*, 2019 MT 199, ¶ 12, 397 Mont. 85, 447 P.3d 463 (citing *Boehm v. Park Cty.*, 2018 MT 165, ¶ 7, 392 Mont. 72, 421 P.3d 789). We review an order granting

---

[4] Yellowstone Disposal included the following issues in its briefing: 1) The District Court's alleged failure to consider Yellowstone Disposal's alternative request for relief; 2) The District Court's alleged "failure to interpret facts in the light most favorable to Yellowstone Disposal"; and 3) Whether DEQ has a clear legal duty to issue Yellowstone Disposal the License because it missed the statutory time limits.

a motion to dismiss under Rule 12(b)(6) de novo. *Barthel v. Barretts Minerals Inc.*, 2021 MT 232, ¶ 9, 405 Mont. 345, 496 P.3d 541 (citation omitted).

**DISCUSSION**

¶13   *Did the District Court err by denying Yellowstone Disposal's petition for writ of mandamus?*

¶14   "'A writ of mandate is an extraordinary remedy available in only rare cases.'" *Allied Waste Servs.*, ¶ 19 (quoting *Boehm*, ¶ 9). "'The writ is available where the party applying for it is entitled to performance of a clear legal duty by the party against whom the writ is sought and there is no speedy and adequate remedy in the ordinary course of law . . . . If the first part of the standard is not met—that is, if no clear legal duty is established— issuance of the writ is barred.'" *Boehm*, ¶ 9 (quoting *Best v. Police Dep't of Billings*, 2000 MT 97, ¶ 14, 299 Mont. 247, 999 P.2d 334); *see also* § 27-26-102, MCA.

¶15   The "clear legal duty" must be a ministerial act that allows the agency no discretion. "We consider an act to be ministerial where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Beasley v. Flathead County Bd. of Adjustments*, 2009 MT 120, ¶¶ 16-17, 350 Mont. 171, 205 P.3d 812 (citing *Smith v. County of Missoula*, 1999 MT 330, ¶ 28, 297 Mont. 368, 992 P.2d 834).

¶16   Yellowstone Disposal argues "[t]he expiration of [the MEPA statutory deadlines] imposed a clear legal duty on DEQ to issue Yellowstone Disposal's requested license," citing § 75-1-208(7)(a), MCA, which provides:

> [I]f an agency has not completed the environmental review by the expiration of the original or extended time period, the agency may not withhold a permit

8

or other authority to act unless the agency makes a written finding that there is a likelihood that permit issuance or other approval to act would result in the violation of a statutory or regulatory requirement.

¶17 DEQ does not dispute that it failed to meet the statutory and administrative time limits governing its environmental review of Yellowstone Disposal's original application. However, it argues it has no "present, clear legal duty" to issue the License or make a final decision on the application because, without a valid zoning certificate, the modified application is incomplete. Therefore, DEQ is not required at this point to "process the application in accordance with the timeframes of § 75-1-208(4), MCA ('[a]ll time limits are measured from the date the agency receives a complete application'), or ARM 17.50.513." Further, DEQ argues it is "obligated under the []SWMA and MEPA to evaluate both Yellowstone Disposal's application modifications and the effect of Richland County's recission of its zoning certification."

¶18 The parties also dispute whether DEQ's Stay Letter properly postponed its review of Yellowstone Disposal's application under ARM 17.50.513(2) ("If an application [for an SWMS] is incomplete, the department shall notify the applicant in writing within 15 days after the initial review is completed and shall postpone processing the application until the material necessary to complete the application is received and the application is determined to be complete."). DEQ asserts it appropriately exercised its authority to postpone review once it determined Yellowstone Disposal's application was incomplete as lacking a valid zoning certificate, and that its Stay Letter satisfied the requirement of "a written finding that there is a likelihood that permit issuance or other approval to act would result in the violation of a statutory or regulatory requirement" under § 75-1-208(7)(a), MCA, therefore

9

authorizing DEQ to properly withhold the License. Yellowstone Disposal disagrees, arguing DEQ "rescind[ed] its completeness determination" and "indefinitely postpone[d] review" of its application, which it describes as an "ultra vires act by the agency."

¶19 An agency "shall comply" with the MEPA environmental review procedure, including adhering to the time limits outlined in the statute. Section 75-1-208(1)(a), MCA. "[A]n agency is subject to the time limits" in order to "ensure a timely completion of the environmental review process"; "[a]ll time limits are measured from the date the agency receives a complete application." Section 75-1-208(4)(a), MCA. Once DEQ certifies an application as complete, it has 60 days to complete the public scoping process and 90 days to complete an environmental review. Section 75-1-208(4)(a)(i),(ii), MCA. "The agency may extend the time limit one time, and the extension may not exceed 50% of the original time period [stated in the statute]." An extension is obtained "by notifying the project sponsor in writing that an extension is necessary and stating the basis for the extension." Section 75-1-208(5), MCA. Therefore, DEQ can only unilaterally extend the public scoping process by up to 30 days and the time to complete an environmental review by up to 45 days. After one extension, any further delay must be upon mutual agreement between DEQ and the applicant. Section 75-1-208(5), MCA.

¶20 DEQ notified Yellowstone Disposal that its original application was complete and then was silent for about 160 days, at which point it notified Yellowstone Disposal it was extending the review time by another 90 days. DEQ did not "stat[e] the basis for the extension," as required by § 75-1-208(5), MCA. Following this extension, DEQ took 468 days to issue the draft EA. From the time Yellowstone Disposal advised DEQ that it would

10

modify its application in response to the FAA determination, DEQ took 133 days to respond with the Stay Letter. Both Yellowstone Disposal's notification to DEQ about altering its application to no longer accept putrescible waste, and the receipt of Richland County's Zoning Letter, occurred well after the statutory time for DEQ to decide on the original, complete application had expired. None of DEQ's actions on the application were completed within the statutory deadlines proscribed by the Legislature.

¶21 Perhaps more concerning is DEQ's nonchalance about the statutory time requirements.[5] DEQ missed every deadline but offers no explanation or justification for its actions, and the record reflects apparent indifference to the consequences—failing to satisfy the Legislature's directive to "ensure a timely completion of the environmental review process" and imposing long delays upon the applicant.[6] Section 75-1-208(4)(a), MCA. The Legislature provided a clear procedure for extension of the statutory deadlines for review when necessary, but DEQ also failed to comply with that procedure. Section 75-1-208(5), MCA. Under either the original application or the modified application, DEQ failed to meet time limits provided by statute and administrative rule.

¶22 However, the determinative question here is whether DEQ had a clear legal duty to issue the License *at the time Yellowstone Disposal petitioned for mandamus*. For its part, Yellowstone Disposal mostly maintained the pace of DEQ, failing to press its timeliness

---

[5] DEQ's own administrative rules follow this same timeline. ARM 17.50.513(3), (4). "The environmental review process for the department's proposed action must follow [MEPA rules]." ARM 17.50.513(5).

[6] Yellowstone Disposal describes DEQ's delayed process as "administrative purgatory."

11

concerns until after the potential licensure problems arose. Had Yellowstone Disposal sought mandamus before Richland County changed its zoning regulations, upon DEQ's determination that its application satisfied governing statutes and regulations, and upon the expiration of the time for review, DEQ may well have had a clear legal duty to issue the License under § 75-1-208(7)(a), MCA. However, during that window, an event occurred that critically impacted the status of the application—the ostensible loss of Yellowstone Disposal's zoning approval.

¶23 A complete application under MEPA "contains all data, studies, plans, information, forms, fees, and signatures required to be included with the application sufficient for the agency to approve the application under the applicable statutes and rules." Section 75-1-220(3), MCA. "An owner or operator of a solid waste management system shall construct, maintain, and operate that system in conformance with the requirements of . . . all local zoning . . . provisions, and any other legal requirements that may be in effect." ARM 17.50.1116(1). DEQ's administrative rules for SWMS licensing require an application to include "zoning information" and "vicinity maps . . . delineat[ing] . . . zoning and existing and allowed land use" within one mile of the proposed facility. ARM 17.50.508(1)(m),(o)(i). DEQ included in its draft EA a map provided by Yellowstone Disposal in its original application, stating, "Zoning: There is no zoning in Richland County outside of Sidney and Fairview city limits," at the proposed location of the facility. However, this zoning assessment is no longer accurate in light of Richland County's actions, and therefore DEQ can no longer rely on this portion of Yellowstone Disposal's application, or upon its own determination in the draft EA that "[c]onstruction and

12

operation of the Facility does not conflict with any local, state, or federal laws, requirements or formal plans." In sum, DEQ no longer possesses all the materials "required to be included with the application sufficient for the agency to approve the application under the applicable statutes and rules." Section 75-1-220(3), MCA. We must conclude that DEQ did not then have a clear legal duty to act, and that Yellowstone Disposal did not satisfy the requirements for mandamus. *See Allied Waste Servs.*, ¶ 19.

¶24 Both parties cite *Bostwick Props. v. Mont. Dep't of Natural Res. & Conservation*, 2009 MT 181, 351 Mont. 26, 208 P.3d 868, in support of their respective positions. Bostwick applied to the Department of Natural Resources and Conservation (DNRC) for a water use permit. *Bostwick*, ¶ 2. DNRC exceeded the statutory time limit for deciding to "grant, deny, or condition" the application, and Bostwick petitioned for a writ of mandamus to compel DNRC to approve the permit. *Bostwick*, ¶¶ 8-9. Shortly afterwards, DNRC issued a "statement of opinion" concluding that Bostwick's application failed to meet the requirements for permit issuance. *Bostwick*, ¶ 10. The District Court granted the writ because DNRC "had failed to take proper action on Bostwick's permit application within the [statutory timeframes] in spite of the fact that it had all the information required to do so." *Bostwick*, ¶ 12.

¶25 We agreed that "[o]nce Bostwick submitted an application which was 'correct and complete,' and thus eligible to go forward in the permit consideration process, DNRC had a clear, legal duty to process that application in accordance with the applicable timeframes and procedures." And, similar to our reasoning here, we explained that "DNRC clearly failed to uphold this duty and could have been commanded to make a decision one

13

way or another as soon as those timeframes had lapsed." *Bostwick*, ¶ 22. Nonetheless, we reversed the writ's issuance, holding:

> Because Bostwick has not satisfied [the] criteria [for permit issuance], as a matter of law *DNRC is simply not under a mandatory legal duty to issue the water permit at this time . . . .* the issuance of the water permit itself does not become a clear, legal duty until Bostwick proves, by a preponderance of the evidence, that the required criteria have been satisfied. This has not yet happened as is clear from DNRC's statement of opinion.

*Bostwick*, ¶¶ 21-22 (emphasis added).

¶26 Yellowstone Disposal's situation is similar. Although DEQ is prohibited under § 75-1-208(7)(a), MCA, from withholding a license upon expiration of the statutory time period without making "a written finding that there is a likelihood" that issuance of a license "would result in the violation of a statutory or regulatory requirement," Yellowstone Disposal must nonetheless satisfy the criteria for issuance of the License. DEQ plainly missed the deadlines, but the agency must still be able to legally take the action requested. The zoning action that took place after the expiration of the deadline and before issuance of the License rendered DEQ legally unable to do so.

¶27 Yellowstone Disposal alternatively argues DEQ has a clear legal duty "to issue a statutorily compliant decision on Yellowstone Disposal's Application," that is, to act on the application "one way or another." It cites the requirements DEQ must fulfill before denying an application for an SWMS license, but here DEQ stayed the processing of the application pending receipt of the new zoning certificate, and did not deny the application. DEQ was therefore not yet subject to those requirements. In its Stay Letter, DEQ informed Yellowstone Disposal: "DEQ has decided to stay its environmental review and licensing

14

determination . . . *until Yellowstone Disposal submits a new zoning certification from Richland County.*" (Emphasis added.)  While Yellowstone Disposal contends that DEQ "indefinitely postpone[d] further review" of its application without authority to do so, leaving it with no option but to pursue mandamus, we disagree.  DEQ clearly communicated what Yellowstone Disposal needed to do to complete its application and for review to resume, and thus Yellowstone Disposal was not left with no other option. "[F]ailure to exhaust administrative remedies precludes the issuance of a writ of mandate because there is otherwise a plain, speedy, and adequate remedy of law." *Boehm*, ¶ 18 (citations omitted).  Yellowstone Disposal relies on the language in *Bostwick* that DNRC "could have been commanded to make a decision one way or another as soon as those timeframes had lapsed," *Bostwick*, ¶ 22, but that language was referencing the duties of a different agency under § 85-2-310, MCA (2009), which imposes a different requirement upon the agency than the statutes at issue here.[7]

¶28  In the event Yellowstone Disposal provides the necessary materials for its application, DEQ is statutorily mandated to complete its environmental review as required by § 78-1-208, MCA.  Or, if Yellowstone Disposal advises DEQ that it cannot or will not provide any additional information in support of its application, then DEQ likewise can

---

[7] We decline to further consider whether DEQ's Stay Letter was a proper exercise of authority to postpone review under § 75-1-208(7)(a), MCA, and ARM 17.50.513(2), because of our precedent that "[a]n action already done cannot be undone by mandamus, however erroneous it may have been." *Beasley*, ¶ 15 (citing *State ex rel. Popham v. Hamilton City Council*, 185 Mont. 26, 29, 604 P.2d 312, 314 (1979)).  The validity or invalidity of the Stay Letter does not alter the ultimate conclusion that DEQ did not have a present, clear legal duty to issue the License.

proceed on the application. If DEQ determines to deny it, it must follow the procedure in § 75-10-224, MCA, and give Yellowstone Disposal written notice and an opportunity to be heard. *See Bostwick*, ¶ 22. If Yellowstone Disposal disagrees with DEQ's action on the application, it can appeal administratively and then, if necessary, to the District Court. *See Boehm*, ¶ 18.

¶29 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

16